STATE OF CONNECTICUT *v.* RAYMOND D'ANTUONO

SPEZIALE, C. J., PETERS, PARSKEY, ARMENTANO and SHEA, Js.

Argued January 6—decision released March 9, 1982

*Joette Katz,* assistant public defender, with whom, on the brief, was *Anthony V. DeMayo,* public defender, for the appellant (defendant).

*Linda K. Lager,* assistant state's attorney, with whom, on the brief, were *Arnold Markle,* state's attorney, and *Michael Dearington,* assistant state's attorney, for the appellee (state).

ARMENTANO, J. On July 23, 1978, a young woman was atrociously beaten and stabbed to death with kitchen utensils. The defendant was indicted by a grand jury for the crime of murder in violation of General Statutes § 53a-54a (a).[1] He elected to be tried by a three-judge court. The defendant was found guilty as charged, and on June 20, 1979, was sentenced to a term of not less than twenty-five years to life. In the defendant's appeal from the judgment rendered on his conviction, the issues are whether, at the time of the killing, (1) the defendant acted under the influence of an extreme emotional disturbance for which there was a reasonable explanation or excuse, mitigating culpability by explaining his specific intent; and (2) the defendant was so intoxicated that he lacked the capacity to form the specific intent to cause the death of the victim. General Statutes § 53a-54a (a). The defendant does not dispute that he caused her death.

---

[1] General Statutes § 53a-54a (a) provides: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime."

The New Haven police entered the victim's New Haven apartment at approximately 11:15 o'clock on the night of Sunday, July 23, 1978. Her mother had become alarmed when she did not report to work that day at Yale-New Haven Hospital or answer her telephone. The police found the victim lying dead in the bathtub with a canvas handbag over her head. The trial court could reasonably have found that she had been stabbed repeatedly with a two-tined carving fork, a three-tined fork, and a serrated knife with a two-pronged tip. Her nose had been broken, and her face and upper body were severely bruised. These multiple blunt force injuries and stabbings, which penetrated the right common carotid artery, internal jugular veins and heart, and hemorrhaged into the chest and heart sac, caused her death.

Moreover, her body exhibited at least two post-mortem slashes extending from each breast to her knees. These slashes probably were executed with the carving fork, which was found with both tines bent back on themselves, and clean of most of the blood, in the bathroom sink. The other fork and the knife were found scattered among the contents of the victim's handbag on the living room floor. One of the fork tines had been broken off, and the other tines were bent. The handles of both utensils were also broken off and found in the bathtub with the body.

The trial court could reasonably have inferred that some of the stabbings occurred in the living room and some in the bedroom, before the body was dragged on the floor into the bathroom and placed in the bathtub, together with the victim's car keys, a book, and several papers.

The defendant met the victim at a bar in New Haven on Thursday, July 20, 1978, and spent the night at her apartment. They set a date to meet on Saturday, July 22, 1978, after she worked the 1:30 to 10:00 o'clock evening shift as a registered nurse at the Yale-New Haven Hospital emergency room. The defendant was late for the date because he had overslept.

The couple arrived at a bar, located a few blocks from the victim's apartment in New Haven, at approximately midnight. Before they left the bar at 2:00 o'clock in the morning the bartender served approximately three rum and cokes to the victim, and four or five twelve-ounce bottles of beer to the defendant. The defendant told the bartender that that evening he had taken some Valium. They appeared to the bartender to be a normal couple out on a date. A long-time friend of the defendant testified that he, the defendant and a woman with the same name as the victim shared a marijuana cigarette that night outside the bar, at the defendant's suggestion.

As they were leaving the bar, the defendant told the bartender that they were returning to the victim's apartment to listen to music and relax. A woman who was sitting on her porch on the route between the victim's apartment and a sandwich shop observed the couple walking toward the shop and back in the direction of the apartment. On their way back to the apartment the defendant appeared upset that the victim could not find his glasses after searching through her purse. Neither of them appeared intoxicated.

According to the defendant, when they arrived back at the apartment they engaged in sexual inter-

course, after which an argument ensued. He claims that the victim was very upset because she thought he was only interested in casual sex and did not want to live with her. The defendant claims that when he tried to reassure her she attempted to stab him with a large two-tined carving fork. After struggling with her over the fork, he claims to remember nothing further until he found himself in her living room, and, after searching, found the victim in the bathtub.

Upon discovering the body, the defendant took a nap on the blood-stained bed. Then, the defendant placed a canvas handbag over her head, wiped some of the blood from the floor and the walls, attempted to erase his fingerprints and washed his hands in the sink. He left the apartment at dawn, and returned home to contemplate. He made no attempt to ascertain whether she was dead, and claims he did not know she was dead until he read a newspaper article the next day.

Sometime between 2:30 and 3:30 o'clock on Sunday afternoon the defendant telephoned the victim's place of employment and asked to speak with her. Later that afternoon, he returned to the bar, slept there for a few hours and left at approximately 11 o'clock at night. He telephoned the victim's apartment at approximately 4 o'clock Monday morning and spoke with the police officer who had answered the phone. Upon hearing that the police were involved in a serious investigation and that the victim was in guarded condition, he agreed to be interviewed by the police. At 5:45 o'clock in the morning the defendant voluntarily appeared at the police station where he explained to the police that he had left

the victim's apartment early Sunday morning because she was expecting a former boyfriend to arrive.

On Monday evening he returned to the bar for a few hours, and told the bartender that he wished he could find the person who had killed the victim. A New Haven police detective found the defendant there, and the defendant voluntarily went to the police station for further questioning. The defendant claimed to want to cooperate, and explained that he had left the apartment at 3:30 o'clock Sunday morning because the victim was expecting a former boyfriend to arrive at four o'clock. The defendant agreed to assist the police in locating the boyfriend.

On Tuesday, July 25, 1978, after having matched the defendant's fingerprints with those found in the apartment, and after having conducted a search of the defendant's apartment with his consent, two detectives asked the defendant to return with them to the police station. The defendant voluntarily returned to the station, signed a form indicating that he understood his *Miranda* rights, and gave a statement in which he admitted having caused the victim's death.

## I

The defendant's first claim of error is that the trial court erred in finding that he had not proved the affirmative defense of extreme emotional disturbance by a fair preponderance of the evidence. General Statutes § 53a-54a (a) provides, in part, that "it shall be an affirmative defense [to murder] that the defendant acted under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint

of a person in the defendant's situation under the circumstances as the defendant believed them to be . . . ." In construing this defense, this court has explained that "[i]n determining whether the defendant has established the affirmative defense of extreme emotional disturbance by a fair preponderance of the evidence as a mitigation of murder to manslaughter, the trier of fact must find that: (a) the emotional disturbance is not a mental disease or defect that rises to the level of insanity as defined in the code; (b) the defendant was exposed to an extremely unusual and overwhelming state, that is, not mere annoyance or unhappiness; and (c) the defendant had an extreme emotional reaction to it, as a result of which there was a loss of self-control, and reason was overborne by intense feelings, such as passion, anger, distress, grief, excessive agitation or other similar emotions. Consideration is given to whether the intensity of these feelings was such that his usual intellectual controls failed and the normal rational thinking for the individual no longer prevailed at the time of the act." *State* v. *Zdanis,* 182 Conn. 388, 390–91, 438 A.2d 696 (1980), cert. denied sub nom. *Zdanis* v. *Connecticut,* 450 U.S. 1003, 101 S. Ct. 1715, 68 L. Ed. 2d 607 (1981); see General Statutes § 53a-12 (b);[2] *State* v. *Elliott,* 177 Conn. 1, 7–10, 411 A.2d 3 (1979); *People* v. *Casassa,* 49 N.Y.2d 668, 675, 404 N.E.2d 1310, cert. denied sub nom. *Casassa* v. *New York,* 449 U.S. 842, 101 S. Ct. 122, 66 L. Ed. 2d 50 (1980).

Extreme emotional disturbance does not negate intent. See *Patterson* v. *New York,* 432 U.S. 197,

---

[2] General Statutes § 53a-12 (b) provides: "When a defense declared to be an affirmative defense is raised at a trial, the defendant shall have the burden of establishing such defense by a preponderance of the evidence."

207, 97 S. Ct. 2319, 53 L. Ed. 2d 281 (1977) ; *State* v. *Zdanis,* supra, 395–96; *State* v. *Elliott,* supra, 6. It serves merely to explain reasonably the circumstances leading to the formation of intent. *State* v. *Elliott,* supra, 6; *People* v. *Patterson,* 39 N.Y.2d 288, 302, 347 N.E.2d 898 (1976), aff'd sub nom. *Patterson* v. *New York,* 432 U.S. 197, 97 S. Ct. 2319, 53 L. Ed. 2d 281 (1977). The purpose of the defense is to render the accused less culpable because his intentional acts were caused by an extreme emotional disturbance. *State* v. *Elliott,* supra, 6; *People* v. *Patterson,* supra, 302. Like intent, extreme emotional disturbance is an issue to be determined by the trier of fact.

This court will construe the evidence in the light most favorable to sustaining the trial court's verdict and will affirm the conclusion of the trier of fact if it is reasonably supported by the evidence and the logical inferences drawn therefrom. *State* v. *Perez,* 182 Conn. 603, 606, 438 A.2d 1149 (1981) ; see, e.g., *State* v. *Gaynor,* 182 Conn. 501, 503, 438 A.2d 749 (1980) ; *State* v. *Festo,* 181 Conn. 254, 259, 435 A.2d 38 (1980) ; *State* v. *Avcollie,* 178 Conn. 450, 466, 423 A.2d 118 (1979). Our review is the same whether the trier of fact is a judge, a panel of judges, or a jury. *State* v. *Perez,* supra; see *State* v. *Holley,* 174 Conn. 22, 26, 381 A.2d 539 (1977). The probative force of direct and circumstantial evidence is the same. *State* v. *Nemeth,* 182 Conn. 403, 410, 438 A.2d 120 (1980).

The defendant introduced no expert testimony that he could have been acting under an extreme emotional disturbance when he killed the victim. He relies solely on the gruesome manner of the killing and on his own testimony that he "freaked out"

when she scratched him with the carving fork. Although this evidence would be relevant to a finding that his self-control and reason were overcome by an extreme emotional reaction, the panel, if we assume that it credited the defendant's testimony, was not bound to conclude that it provided "a reasonable explanation or excuse" for his actions. In his statement to the police the defendant explained that the arguments he had with the victim that night over the glasses and over their relationship were not so upsetting as to preclude their engaging in sexual intercourse. He focuses on her "attack" with the carving fork as the cause for his loss of self-control. It was within the province of the panel to accept or reject this portion of the defendant's testimony and also to conclude whether it was sufficient to constitute the "extreme emotional disturbance" required by General Statutes § 53a-54a (a). The trial court did not err in rejecting the affirmative defense of extreme emotional disturbance.

## II

The defendant's second claim of error is that the trial court erred in finding that the defendant was not so intoxicated as to negate a finding that he acted with the specific intent to cause the death of the victim. This finding will stand unless it is unreasonably based upon the evidence as construed most favorably toward sustaining the verdict. *State* v. *Stankowski,* 184 Conn. 121, 126, 439 A.2d 918, cert. denied, 454 U.S. 1052, 102 S. Ct. 596, 70 L. Ed. 2d 588 (1981); *State* v. *Avcollie,* supra, 466.

The state must prove beyond a reasonable doubt that the defendant acted with the specific intent to cause the death of the victim. General Statutes

§§ 53a-12 (a),[3] 53a-54a (a); *State* v. *Stankowski,* supra, 125–26; *State* v. *Zdanis,* supra, 395; *State* v. *Holley,* supra, 25. See generally Underwood, "The Thumb on the Scales of Justice: Burdens of Persuasion in Criminal Cases," 86 Yale L.J. 1299, 1301, 1306–11 (1977). "A person acts 'intentionally' with respect to a result or to conduct described by a statute defining an offense when his conscious objective is to cause such result or to engage in such conduct . . . ." General Statutes § 53a-3 (11). "Intent is a mental process which ordinarily can be proven only by circumstantial evidence. An intent to cause death may be inferred from circumstantial evidence such as the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to and immediately following the death." *State* v. *Zdanis,* supra, 396; see, e.g., *State* v. *Holley,* supra, 26; *State* v. *Bzdyra,* 165 Conn. 400, 404–405, 334 A.2d 917 (1973); *State* v. *Litman,* 106 Conn. 345, 352–53, 138 A. 132 (1927). These inferences are necessary because the direct evidence of the accused's state of mind is rarely available. See *State* v. *Rodriquez,* 180 Conn. 382, 404, 429 A.2d 919 (1980); *State* v. *Bzdyra,* supra, 403.

Intoxication is not a defense to murder, but is relevant to the capacity to form specific intent. General Statutes § 53a-7;[4] *State* v. *Smith,* 185 Conn. 63, 70 n.7, 441 A.2d 84 (1981); see, e.g., *State* v. *Bitting,* 162 Conn. 1, 7, 291 A.2d 240

---

[3] General Statutes § 53a-12 (a) provides: "When a defense other than an affirmative defense, is raised at a trial, the state shall have the burden of disproving such defense beyond a reasonable doubt."

[4] General Statutes § 53a-7 provides: "Intoxication shall not be a defense to a criminal charge, but in any prosecution for an offense evidence of intoxication of the defendant may be offered by the defendant whenever it is relevant to negate an element of the crime charged, provided when recklessness or criminal negligence is an element of the crime charged, if the actor, due to self-induced

(1971). " '[I]ntoxication' means a substantial disturbance of mental or physical capacities resulting from the introduction of substances into the body." General Statutes § 53a-7. "If the cumulative effect of all the evidence, including the evidence of intoxication, justifies finding the particular mental state beyond a reasonable doubt, the . . . verdict precludes a reversal for insufficient evidence of that mental state." *State* v. *Smith,* supra, 70 n.7; see *State* v. *Crawford,* 172 Conn. 65, 69–70, 372 A.2d 154 (1976).

The defendant asserts that he was so intoxicated with liquor and drugs that he could not have formed the intent to cause the death of the victim. Moreover, he liked her and at no time intended to kill her. The defendant offered no expert testimony relevant to his intoxication. He relies on his own statement that he drank ten beers and a few "shots" at the bar, smoked marijuana behind the bar, and upon returning to the victim's apartment, ingested some Valium, drank some wine, and smoked more marijuana. A long-time friend of the defendant corroborated that they had smoked marijuana behind the bar that night, and testified further that the defendant was staggering a little and generally did not hold his liquor well. Even if the court had accepted this testimony as true, which it was not bound to do, the court could have reasonably concluded that the defendant was not sufficiently intoxicated to cast a reasonable doubt on his capacity to form the specific intent to cause the death of the victim.

---

intoxication, is unaware of or disregards or fails to perceive a risk which he would have been aware of had he not been intoxicated, such unawareness, disregard or failure to perceive shall be immaterial. As used in this section, 'intoxication' means a substantial disturbance of mental or physical capacities resulting from the introduction of substances into the body."

Specific intent could reasonably be inferred from the manner of killing and the immediately subsequent actions of the defendant. The repetition and force of the blows and stabs, both before and after death occurred, evidence an intent to cause death. Expert testimony established that none of the wounds would have caused death or unconsciousness before several minutes. This is corroborated by testimony of a woman in a waiting room located in a hospital across the street from the victim's apartment who, at 3:45 o'clock that Sunday morning, heard a woman scream for help. A few minutes later, she screamed again, and then the screaming stopped. Clearly the victim struggled, but the defendant persisted in his actions.

Moreover, when he allegedly first became aware of the victim's body in the bathtub, he made no attempt to ascertain whether she was dead or alive, or to seek assistance for her clearly visible injuries. Instead, while admittedly uncertain of whether she was living, he took a nap and attempted to erase evidence of his culpability. These actions indicate such indifference toward the well-being of the victim that they lend some support to an inference of his earlier specific intent to cause her death.

The cumulative effect of this evidence amply supports the trial court's finding that the defendant acted with the specific intent to cause the death of the victim.

There is no error.

In this opinion the other judges concurred.