******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# STATE OF CONNECTICUT *v.* SEMMION WATSON
## (AC 41563)

DiPentima, C. J., and Bright and Lavery, Js.

*Syllabus*

Convicted, following a trial before a three judge panel, of the crime of murder and, following a trial to the court, of the crime of sale of narcotics, the defendant appealed to this court. The defendant's conviction stemmed from an incident in which he sold crack cocaine to the victim, who later refused to leave the defendant's home. Thereafter, the defendant engaged in a physical altercation with the victim and stabbed him fifty-one times, resulting in the victim's death. On appeal, the defendant claimed, inter alia, that the state failed to disprove his defenses of self-defense and defense of premises beyond a reasonable doubt. *Held*:

1. The panel properly concluded that the state presented sufficient evidence to meet its burden of disproving the defendant's claims of self-defense and defense of premises beyond a reasonable doubt: the defendant's claim that he experienced a blackout following his physical altercation with the victim was inconsistent with his statement to the police, which included multiple details of events that he alleged happened after he claimed to have blacked out, his statement to the police included other irregularities regarding what occurred following the stabbing, the nature and extent of both the victim's and the defendant's wounds did not support the defendant's self-defense narrative, and the defendant's actions following the stabbing, in which he acknowledged that the victim lay on the floor bleeding significantly but failed to seek medical assistance, changed his clothes upon leaving his apartment and purposefully avoided his apartment and the police for thirty-six hours following the stabbing, belied an actual belief on the defendant's part that he was acting in self-defense; furthermore, the panel was not obligated to accept as credible the defendant's evidence or version of events, and the evidence supported the panel's findings that the defendant did not believe that the victim was using or about to use deadly physical force or that deadly physical force was necessary to prevent the victim from committing a crime of violence.

2. The defendant could not prevail on his claim that the trial court improperly precluded the testimony of his expert witness: the expert's proffered opinion that an individual in a stressful situation may overreact constituted knowledge that was common to the average person and, thus, did not require expert testimony, and the defendant's claim that the court improperly subjected the expert's proffered opinions on certain physiological effects and blackouts caused by stressful situations to the standard set forth in *State* v. *Porter* (241 Conn. 57) for the admissibility of scientific evidence was unavailing, as the proffered expert's testimony was premised on scientific studies and, thus, needed to be evaluated pursuant to the threshold admissibility standard set forth in *Porter*; accordingly, the trial court did not abuse its discretion in subjecting the two proffered opinions to a *Porter* analysis.

Argued September 18, 2019—officially released January 21, 2020

*Procedural History*

Substitute information charging the defendant with the crimes of murder, sale of narcotics and tampering with physical evidence, brought to the Superior Court in the judicial district of New Haven, where the murder charge was tried to a three judge panel, *Alander*, *O'Keefe* and *Cradle*, *Js.*, and the remaining two charges were tried to the court, *Alander*, *J.*; subsequently, the court, *Alander*, *J.*, granted the defendant's motion for a judgment of acquittal with respect to the tampering with physical evidence charge and the court, *Alander*,

*O'Keefe* and *Cradle, Js.*, denied the defendant's motion with respect to the murder charge; judgment of guilty, from which the defendant appealed. *Affirmed.*

*Peter G. Billings*, for the appellant (defendant).

*Margaret Gaffney Radionovas*, senior assistant state's attorney, with whom, on the brief, were *Patrick J. Griffin*, state's attorney, and *Seth R. Garbasky*, senior assistant state's attorney, for the appellee (state).

*Opinion*

DiPENTIMA, C. J. The defendant, Semmion Watson, appeals from the judgment of conviction of murder in violation of General Statutes § 53a-54a (a) and sale of narcotics in violation of General Statutes § 21a-278 (b), rendered after a trial to the court. On appeal, the defendant claims that (1) the state failed to disprove his self and premises defenses beyond a reasonable doubt and (2) the court improperly precluded the testimony of a defense witness. We disagree and, accordingly, affirm the judgment of conviction.

The trial court set forth the following facts in its memorandum of decision that are relevant to our decision. On October 5, 2013, the victim, Anthony Stevenson, entered the defendant's New Haven apartment to purchase crack cocaine. After ingesting the drug in the apartment, the victim refused the defendant's request that he depart. After the defendant grabbed the victim in an effort to force him to leave the apartment, the two struggled over a knife with a blade of approximately six inches. Once he gained possession of the knife, the defendant repeatedly stabbed the victim. The victim sustained fifty-one stab wounds, including thirty-one in the back. Fourteen stab wounds penetrated the victim's chest and abdominal cavities, causing injuries to his lungs, liver, spleen and kidney. The defendant exited the apartment as the victim lay on the floor profusely bleeding and uttering that he "was dying." At no point did the defendant summon medical assistance for the victim; instead, he "purposefully did not return to his apartment or disclose his whereabouts to the police" until his arrest approximately thirty-six hours later. The victim died as a result of the stab wounds.

In a three count information dated August 30, 2016, the state charged the defendant with murder, sale of narcotics and tampering with physical evidence in violation of General Statutes § 53a-155 (a) (1). The defendant elected a court trial before a three judge panel, *Alander, O'Keefe* and *Cradle, Js.* (panel), on the murder charge, and a court trial before Judge Alander, the presiding judge of the panel, on the remaining two charges.[1] At the conclusion of the state's case, the defendant filed a motion for a judgment of acquittal as to the murder and tampering with physical evidence charges. The panel denied the defendant's motion for a judgment of acquittal as to the murder charge, and Judge Alander granted the defendant's motion with respect to the tampering with physical evidence charge.

On September 29, 2016, the panel found the defendant guilty of murder. Specifically, the panel unanimously concluded that the defendant had stabbed the victim on the evening of October 5, 2013, causing his death. The panel found that "[t]he sheer number of stab wounds—fifty-one—is powerful evidence that the defendant

intended to cause the death of the [victim]. Also telling is the depth of those wounds—as much as six inches—and the force needed to inflict them. Finally, the defendant's failure to render or seek medical assistance to the obviously dying [victim] reflects an intent to cause his death."

The panel further concluded that the state had disproved, beyond a reasonable doubt, the defendant's claims of defense of self; see General Statutes § 53a-19; and defense of premises. See General Statutes § 53a-20. Specifically, it found that "the defendant did not actually believe that [the victim] was using or about to use deadly physical force, or inflicting or about to inflict great bodily harm and that the defendant did not actually believe deadly physical force was necessary to prevent an attempt by [the victim] to commit a crime of violence. We simply do not believe the defendant's assertions that [the victim] first came at him with a knife and that he used deadly physical force to defend himself and his premises."

Judge Alander found the defendant guilty of sale of narcotics. On December 1, 2016, the panel sentenced the defendant to forty-five years of incarceration on the murder count and Judge Alander imposed a ten year concurrent sentence on the sale of narcotics count, for a total effective sentence of forty-five years of incarceration. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the state failed to disprove his self and premises defenses beyond a reasonable doubt. Specifically, he argues that the panel erred in concluding that the state had met its burden of disproving these justification defenses, as its decision was unsupported by the evidence and drew unreasonable inferences. We are not persuaded.

We begin with our standard of review and the relevant legal principles. "On appeal, the standard for reviewing sufficiency claims in conjunction with a justification offered by the defense is the same standard used when examining claims of insufficiency of the evidence. . . . In reviewing a sufficiency of the evidence claim, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [fact finder] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . . This court cannot substitute its own judgment for that of the [fact finder] if there is sufficient evidence to support the [fact finder's] verdict . . . . We ask . . . whether there is a reasonable view of the evidence that supports the [fact finder's] verdict of guilty. . . .

"The rules governing the respective burdens borne by the defendant and the state on the justification of self-defense [and defense of premises] are grounded in the fact that [u]nder our Penal Code, self-defense, as defined in . . . § 53a-19 (a) . . . is a defense, rather than an affirmative defense. See General Statutes § 53a-16. Whereas an affirmative defense requires the defendant to establish his claim by a preponderance of the evidence, a properly raised defense places the burden on the state to disprove the defendant's claim beyond a reasonable doubt. See General Statutes § 53a-12. Consequently, a defendant has no burden of persuasion for a claim of self-defense [or defense of premises]; he has only a burden of production. That is, he merely is required to introduce sufficient evidence to warrant presenting his claim of self-defense [or defense of premises] to the [fact finder]. . . . Once the defendant has done so, it becomes the state's burden to disprove the defense beyond a reasonable doubt." (Citation omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Alicea*, 191 Conn. App. 421, 446–47, 215 A.3d 184, cert. granted on other grounds, 333 Conn. 937, 219 A.3d 373 (2019); *State* v. *Nicholson*, 155 Conn. App. 499, 505–506, 109 A.3d 1010, cert. denied, 316 Conn. 913, 111 A.3d 884 (2015); see also *State* v. *Grasso*, 189 Conn. App. 186, 198–201, 207 A.3d 33, cert. denied, 331 Conn. 928, 207 A.3d 519 (2019).[2]

Next, we set forth the substantive principles with respect to the defendant's claims of self-defense and defense of premises. Regarding the claim of self-defense, "[u]nder § 53a-19 (a), a person may justifiably use deadly physical force in self-defense only if he reasonably believes both that (1) his attacker is using or about to use deadly physical force against him, or is inflicting or about to inflict great bodily harm, and (2) that deadly physical force is necessary to repel such attack. . . . We repeatedly have indicated that the test a [fact finder] must apply in analyzing the second requirement, i.e., that the defendant reasonably believed that deadly force, as opposed to some lesser degree of force, was necessary to repel the victim's alleged attack, is a subjective-objective one. The [fact finder] must view the situation from the perspective of the defendant. Section 53a-19 (a) requires, however, that the defendant's belief ultimately must be found to be reasonable." (Internal quotation marks omitted.) *State* v. *Revels*, 313 Conn. 762, 779, 99 A.3d 1130 (2014), cert. denied, 574 U.S. 1177, 135 S. Ct. 1451, 191 L. Ed. 2d 404 (2015); see also *State* v. *Terry*, 161 Conn. App. 797, 805–807, 128 A.3d 958 (2015), cert. denied, 320 Conn. 916, 131 A.3d 751 (2016).[3]

Regarding the claim of defense of premises, § 53a-20 provides in relevant part: "A person in possession or control of premises, or a person who is licensed or privileged to be in or upon such premises, is justified

in using reasonable physical force upon another person when and to the extent that he reasonably believes such to be necessary to prevent or terminate the commission or attempted commission of a criminal trespass by such other person in or upon such premises; *but he may use deadly physical force* under such circumstances only (1) in defense of a person as prescribed in section 53a-19, or (2) *when he reasonably believes such to be necessary to prevent an attempt by the trespasser* to commit arson *or any crime of violence* . . . ." (Emphasis added.) See also *State* v. *Terwilliger*, 294 Conn. 399, 409, 984 A.2d 721 (2009); *State* v. *Nicholson*, supra, 155 Conn. App. 506–507.

We begin our analysis by setting forth the defendant's theory of self-defense and defense of premises. See, e.g., *State* v. *Revels*, supra, 313 Conn. 779; *State* v. *Grasso*, supra, 189 Conn. App. 198. The defendant did not testify at trial. Instead, defense counsel used the video recording and transcript of the defendant's October 7, 2013 interview with the police, both of which were admitted into evidence, to establish the justification defenses. In that interview, the defendant admitted that he had sold $60 of crack cocaine to the victim, and allowed him to ingest the drug in his apartment. The victim asked for more crack cocaine, and the defendant responded by demanding additional payment. The victim failed to tender any further payment. The defendant then instructed the victim to leave, but the victim refused, stating: "I ain't going nowhere." The defendant attempted to grab the victim, at which point the victim brandished a silver pocketknife. The victim then stabbed the defendant in the knee twice and cut his finger. The defendant attempted to leave, but the victim blocked the only means of egress. At this point, the defendant claimed to have "blacked out."

Upon further questioning, the defendant provided additional details, despite his blackout claim. Specifically, the defendant stated that after he had been stabbed in the knee, the two combatants separated and he told the victim: "Yo, you got to go." The victim responded: "You're not going nowhere." The two men then resumed their physical struggle, and the defendant caused the victim to drop the knife. The knife fell onto a dresser, and the defendant picked it up. The defendant then reasserted his claim of a blackout. He could not recall stabbing the victim, only that he got out the door. The defendant did remember that the victim's head was near the bedroom and his feet near the kitchen. The victim stated that he was dying. The defendant responded that he was leaving and that the whole altercation could have been avoided. Contradicting his previous statement, the defendant indicated that he knew he had stabbed the victim, who bled "a lot."

Despite his two prior blackout claims, the defendant further explained that he left the apartment and

obtained a change of clothes from an unidentified female. Approximately thirty-six hours later, while sitting in a park and speaking to his former wife on the phone, the defendant "flagged down" a police officer and stated that he was "the guy you're looking for." Near the end of the interview, the defendant expressed surprise when told that the victim had sustained approximately fifty stab wounds.

Next, we consider the evidence before the panel, viewed in a light most consistent with the panel's verdict. The panel "conclude[d] that the state [had] proved beyond a reasonable doubt that the defendant did not actually believe that [the victim] was using or about to use deadly physical force, or inflicting or about to inflict great bodily harm and that the defendant did not actually believe deadly physical force was necessary to prevent an attempt by [the victim] to commit a crime of violence. We simply do not believe the defendant's assertions that [the victim] first came at him with a knife and that he used deadly physical force to defend himself and his premises." In support of this conclusion, the panel pointed to the defendant's inconsistent statements regarding the events that he could and could not recall as a result of his purported blackout. The panel found the defendant's claim of a blackout to be "selective and self-serving" because it allowed him "to avoid explaining the nature of the struggle, if any, with [the victim] once the defendant attains possession of the knife [and, most] tellingly, it frees him from having to explain why it was necessary to stab [the victim] fifty-one times, including thirty-one times in the back."

The panel highlighted other irregularities with the defendant's statement to the police. For example, the defendant had stated that he dropped the knife on the sidewalk in front of his apartment building, but no weapon was located by the police. The defendant also provided vague and incomplete statements regarding (1) where he went after the stabbing and during the approximately thirty-six hour time period between the stabbing and his arrest and (2) the details of what happened to the clothes he wore during the stabbing and how he obtained a change of clothes.

The panel further noted that "[t]he nature and extent of the wounds, both the [victim's] and the defendant's, do not support the defendant's self-defense narrative." Specifically, it iterated that the victim had suffered fifty-one stab wounds, with thirty-one being in the back. This evidence, coupled with the minimal blood stains on the victim's shoes, support the finding that victim was lying on the floor while the defendant stabbed him from above. The panel also found that the lack of extensive defensive wounds on the defendant did not support the "claim of a long struggle necessitating fifty-one thrusts of a knife."[4] Furthermore, the panel, on the basis of photographs of the defendant's injuries and the

testimony of the emergency medical technician and nurse who treated the defendant following his arrest, determined that neither the injury to the defendant's finger nor his knee could be characterized as a stab wound.

The panel also relied on evidence of the defendant's actions after he stabbed the victim. "Finally, the defendant's actions subsequent to the stabbing belie an actual belief on his part that he acted in self-defense. First, the defendant knew prior to leaving his apartment that [the victim] lay on the floor bleeding significantly. He also heard [the victim] proclaim that he was dying. At no point, then or later, did the defendant summon medical assistance for [the victim]. Second, the defendant changed his clothes upon leaving his apartment, did not retain them and professes not to know where they might be. Third, the defendant purposefully did not return to his apartment or disclose his whereabouts to the police for the thirty-six hours prior to his arrest. Each of these acts reveals a consciousness on the defendant's part that he had committed a criminal act and is inconsistent with his claim that he was merely acting to protect himself and his premises."[5]

We emphasize that although the state had the burden of persuading the panel, beyond a reasonable doubt, that the defendant had not acted in self-defense or in defense of his premises, the panel was not obligated to accept, as credible, the defendant's evidence or version of events. *State* v. *Grasso*, supra, 189 Conn. App. 211. As the sole arbiter of the credibility of the witnesses and the weight to be given to specific testimony, the panel was free to disbelieve any or all of the defendant's statement to the police. See *State* v. *Ames*, 171 Conn. App. 486, 501, 157 A.3d 660, cert. denied, 327 Conn. 908, 170 A.3d 679 (2017); see also *State* v. *Pauling*, 102 Conn. App. 556, 572, 925 A.2d 1200 ("[trier of fact] was free to disbelieve the defendant's version of the events that resulted in the injuries to [the victim]"), cert. denied, 284 Conn. 924, 933 A.2d 727 (2007).

We iterate that a person is justified in using deadly physical force in self-defense only if he reasonably believes both that (1) his attacker is using or about to use deadly physical force against him and (2) deadly physical force is necessary to repel the attack. *State* v. *Pranckus*, 75 Conn. App. 80, 88, 815 A.2d 678, cert. denied, 263 Conn. 905, 819 A.2d 840 (2003). Additionally, the use of deadly physical force is permitted in a defense of premises situation when the defendant actually believes it is necessary to prevent arson or an attempted crime of violence. See General Statutes § 53a-20. In the present case, the panel reasonably concluded that the state had presented sufficient evidence to meet its burden of persuasion, and, therefore, the determination of guilt must be sustained. *State* v. *Ames*, supra, 171 Conn. App. 504; see also *State* v. *Lisboa*, 148 Conn. App. 769,

779, 85 A.3d 1244 (2014) (reviewing finding of three judge panel by construing evidence in light most favorable to sustaining verdict and asking whether there is reasonable view of evidence supporting panel's verdict of guilty). Specifically, the panel's findings that the defendant did not actually believe that (1) the victim was using or about to use deadly physical force, or inflict or about to inflict great bodily harm, or (2) deadly physical force was necessary to prevent the victim from committing a crime of violence, are supported by the evidence. Contrary to the defendant's appellate argument, the panel was not bound to accept as true his statements made during the recorded interview with the police. Accordingly, the defendant's sufficiency claim fails.

II

The defendant next claims that the court improperly precluded the testimony of a defense expert witness. Specifically, he argues that the court, *Alander*, *J.*,[6] abused its discretion in granting the state's motion in limine to preclude the expert testimony of Reginald Allard, and that this ruling violated his sixth amendment right to present a defense. We conclude that the court properly granted the state's motion, and, thus, the defendant's constitutional right to present a defense was not violated.

The following additional facts are necessary for the resolution of this claim. In March, 2016, defense counsel notified the state of his intention to offer the expert testimony of Allard "concerning the effect of adrenaline on sensory processing, decision-making, short-term memory, 'fight-or-flight' reactions and related issues as they regard a claim of self-defense." On August 23, 2016, the state filed a motion in limine to preclude this testimony. The state argued that Allard, who had worked as a police officer and police trainer, had no peculiar knowledge or experience related to the issues at trial, that any such knowledge or experience he possessed was "common to the world" and that any testimony from Allard would not assist the trier of fact. The state further contended that "any testimony from . . . Allard on scientific issues is inadmissible under *State* v. *Porter*, 241 Conn. 57[, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998)], because no factors support the reliability of . . . Allard's methods and those methods are irrelevant to the facts involved in the trial." On September 19, 2016, the defendant filed a memorandum in support of Allard testifying.

The court held a *Porter* hearing on September 19, 2016. Allard testified that he was the sole member and chief operating officer of 13th Juror, LLC, an expert witness and police training consulting business. Prior to that, Allard had been a New Britain police officer and a training officer at the Connecticut Police Academy

in the areas of force, restraint and control, shooting decisions, psychology and abnormal behavior. He explained that when an individual is faced with a threat, the adrenal gland, which is located on top of the kidney, secretes a "chemical cocktail" consisting of adrenaline and noradrenaline, which cause feelings of fear and rage, respectively. These chemicals cause a number of physiological effects, including a distorted perception of events. Allard specifically noted that, in the context of a violent attack, an individual with no training in compensating for these physiological effects would be more likely to overreact in an effort to end the threat. He was not able, however, to identify any specific studies to support this opinion.

During cross-examination by the prosecutor, Allard could not identify specifically where in his collection of medical treatises, psychological journals and psychiatric articles the term "chemical cocktail" was used. He acknowledged that he did not have a degree in any of the medical sciences such as biology, chemistry or physiology. Allard then indicated that blackouts may occur in stressful situations,[7] but he was unable to point to any specific scientific studies to support this opinion, or to identify the frequency of their occurrence. He testified that whether a particular individual actually suffered a blackout cannot be verified independently and is based solely on the self-reporting of that individual.

After Allard had completed his testimony, the court heard argument from the parties. The court asked defense counsel to identify precisely Allard's opinions that he sought to have admitted into evidence at the trial. Defense counsel stated that Allard would testify that (1) a person may overreact to a situation due to stress, (2) the chemical cocktail causes certain physiological effects and (3) a person in a stressful situation may experience a blackout. At the conclusion of the hearing, the court issued an oral decision. It began with a summary of the parties' arguments. "The defendant's position is that it's not scientific. The testimony, it's not—I guess that it's just based on [Allard's] experience as opposed to any scientific basis. The state's position is twofold. To the extent it's nonscientific, it's within a lay person's or a juror's experience, and they don't need an expert to opine on those matters, and the second is, that to the extent it is otherwise, it's scientific evidence in which there's not been the appropriate support."

The court proceeded to address each of Allard's opinions in turn. As to Allard's opinion that individuals may overact in a stressful situation, the court concluded that "[a] lay person knows that under stress people can—can overreact to situations. I think that's within the realm of the person's everyday experience. . . . So I don't think that is in need of an expert opinion."

As to the physiological effects resulting from the chemical cocktail, the court stated: "I mean, that's clearly scientific. I mean that's physiological. That's medicine. I don't know how one can claim that that's not scientific. And he—he outlined a number of . . . physiological effects, visual narrowing, auditory exclusions, increased heartrate, decreased breathing, loss of fine motor skills, flash of white light. But he also indicated that it's totally based on the self-reporting of police officers. [There are] . . . no published studies on this. [Allard's] not published on it. He's not aware of anyone else publishing on it. There's no known error rate. The self-reporting hasn't been analyzed or scrutinized to any degree. It's just accepted as wisdom because police officers said it occurred. So that's a problem."

With respect to the third opinion, that blackouts may occur in response to a stressful situation, the court again pointed to Allard's inability to identify any scientific study to support his position. "Now he testified he knows of studies but couldn't identify any. He didn't know the methodology used. He said it wasn't based on any scientific studies, and he couldn't identify any identifiable frequency that they occur. And again, this is physiological. It's—it's medicine." The court further noted that Allard did not testify that his opinions were generally accepted in the relevant scientific community. After considering the other factors set forth in *State* v. *Porter*, supra, 241 Conn. 57, the court precluded Allard from testifying.

We now turn to the relevant legal principles and our standard of review.[8] "The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . The trial court has wide discretion in ruling on the qualification of expert witnesses and the admissibility of their opinions. . . . The court's decision is not to be disturbed unless [its] discretion has been abused, or the error is clear and involves a misconception of the law. . . . Generally, expert testimony is admissible if (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues." (Citations omitted; internal quotation marks omitted.) *State* v. *Iban C.*, 275 Conn. 624, 634, 881 A.2d 1005 (2005); see also *State* v. *Brett B.*, 186 Conn. App. 563, 600–601, 200 A.3d 706 (2018), cert. denied, 330 Conn. 961, 199 A.3d 560 (2019); see generally E. Prescott, Tait's Handbook of Connecticut Evidence (6th Ed. 2019) § 7.3.2, pp. 439–40.

"Beyond these general requirements regarding the admissibility of expert testimony, [t]here is a further hurdle to the admissibility of expert testimony when that testimony is based on . . . scientific [evidence].

In those situations, the scientific evidence that forms the basis for the expert's opinion must undergo a validity assessment to ensure reliability. . . . In *Porter*, this court . . . held that scientific evidence should be subjected to a flexible test, with differing factors that are applied on a case-by-case basis, to determine the reliability of the scientific evidence. . . . Following . . . *Porter* . . . scientific evidence, and expert testimony based thereon, usually is to be evaluated under a threshold admissibility standard assessing the reliability of the methodology underlying the evidence and whether the evidence at issue is, in fact, derived from and based upon that methodology . . . which has been referred to as the fit requirement." (Citations omitted; footnote omitted; internal quotation marks omitted.) *Maher* v. *Quest Diagnostics, Inc.*, 269 Conn. 154, 168, 847 A.2d 978 (2004).

We also note that the defendant has raised both an evidentiary and a constitutional claim. "[T]he federal constitution require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense. . . . The sixth amendment . . . [guarantees] the right to offer the testimony of witnesses, and to compel their attendance, if necessary, [and] is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so that it may decide where the truth lies. . . . When defense evidence is excluded, such exclusion may give rise to a claim of denial of the right to present a defense. . . . *A defendant is, however, bound by the rules of evidence in presenting a defense.* . . . Although exclusionary rules of evidence cannot be applied mechanistically to deprive a defendant of his rights, *the constitution does not require that a defendant be permitted to present every piece of evidence he wishes.*" (Emphasis added; internal quotation marks omitted.) *State* v. *Sampson*, 174 Conn. App. 624, 635, 166 A.3d 1, cert. denied, 327 Conn. 920, 171 A.3d 57 (2017); see also *State* v. *Rogers*, 183 Conn. App. 669, 679–80, 193 A.3d 612 (2018). Guided by these principles, we address each of Allard's proffered opinions in turn.

A

The defendant first argues that the court improperly precluded Allard from testifying that an individual in a stressful situation may overreact on the ground that this opinion constituted knowledge common to the average person, and therefore expert testimony was unnecessary. The state counters that the court did not abuse its discretion in concluding that this opinion did not require expert testimony. We agree with the court's conclusion.

During the *Porter* hearing, Allard testified that an individual trained in the physiological effects of the chemical cocktail caused by a stressful situation acts

more appropriately than an untrained person. He explained that untrained individuals "are more likely to overreact . . . because they . . . are not comfortable with the fear, and as a consequence they are just trying to stop the fear anyway they can." Following a question from the court, Allard conceded that he could not identify a study to support the position that an untrained individual generally overreacts to a violent confrontation.

In concluding that expert testimony was not needed to present this opinion to the fact finder, the court stated: "Everybody knows that. I think that's what is governed by the [Appellate Court's] decision in [*State* v. *Campbell*, 149 Conn. App. 405, 88 A.3d 1258, cert. denied, 312 Conn. 907, 93 A.3d 157 (2014)]. A lay person knows that under stress people can—can overreact to situations. I think that's within the realm of the person's everyday experience. . . . So I don't think that is in need to an expert opinion."

In *State* v. *Campbell*, supra, 149 Conn. App. 408, the victim struck the defendant's brother in the head after a verbal disagreement. The victim then challenged the defendant to a fight, who responded by shooting the victim with a pistol. Id., 408–409. On appeal, the defendant claimed, inter alia, that the court improperly had precluded his expert witness, a psychiatrist, about the "fight or flight" response to the perception of danger. Id., 427–28. The state agreed with the trial court that "human reactions to stressful circumstances that give rise to a fight or flight response are matters that fall within the common experience of the average juror." Id., 430. In affirming the decision of the trial court, we stated: "The proffered testimony . . . was an attempt to provide expertise on inferences which lay persons were equally capable of drawing from the evidence. It is only when an expert witness has a special skill or knowledge, beyond the ken of the average juror, on the particular subject at issue that his testimony can be helpful and, accordingly, should be admitted." (Internal quotation marks omitted.) Id.

In the present case, we emphasize that "[i]t is well settled that [t]he true test of the admissibility of [expert] testimony is not whether the subject matter is common or uncommon, or whether many persons or few have some knowledge of the matter; *but it is whether the witnesses offered as experts have any peculiar knowledge or experience, not common to the world, which renders their opinions founded on such knowledge or experience any aid to the court or the jury in determining the questions at issue*." (Emphasis added; internal quotation marks omitted.) *State* v. *Leniart*, 333 Conn. 88, 142, 215 A.3d 1104 (2019). Furthermore, the need for an expert is determined on a case-by-case basis and is dependent on whether the issues are sufficiently complex to warrant the use of expert testimony as an

aid to the court. *State* v. *Buhl*, 321 Conn. 688, 700, 138 A.3d 868 (2016). We agree with the court's conclusion that the fact that a person may overreact in a stressful situation is not beyond the ken of the average fact finder. Accordingly, the court did not abuse its discretion in excluding this portion of Allard's testimony.

B

The defendant next argues that the court abused its discretion in preventing Allard from testifying that the chemical cocktail causes certain physiological effects and that a person in a stressful situation may experience a blackout. Specifically, he contends that the court improperly subjected these two opinions to the *Porter* test.[9] The state counters that the court correctly determined that these two opinions needed to satisfy the *Porter* standard before they could be admitted into evidence. We agree with the state.

We begin with the relevant legal principles. "In [*State* v. *Porter*, supra, 241 Conn. 57], [our Supreme Court] followed the United States Supreme Court's decision in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and held that testimony based on scientific evidence should be subjected to a flexible test to determine the reliability of methods used to reach a particular conclusion. . . . A *Porter* analysis involves a two part inquiry that assesses the reliability and relevance of the witness' methods. . . . First, the party offering the expert testimony must show the expert's methods for reaching his conclusion are reliable. . . . Second, the proposed scientific testimony must be demonstrably relevant to the facts of the particular case in which it is offered, and not simply be valid in the abstract. . . . Put another way, the proponent of scientific evidence must establish that the specific scientific testimony at issue is, in fact, derived from and based [on] . . . [scientifically reliable] methodology." (Internal quotation marks omitted.) *State* v. *Edwards*, 325 Conn. 97, 124, 156 A.3d 506 (2017); see also *State* v. *Montanez*, 185 Conn. App. 589, 618–19, 197 A.3d 959 (2018), cert. denied, 332 Conn. 907, 209 A.3d 643 (2019); *State* v. *Campbell*, supra, 149 Conn. App. 426–27 (trial court acts as gatekeeper to ensure fact finder hears only relevant evidence grounded in scientific fact and not conjecture and speculation).[10]

This court has recognized that "[a]lthough [our Supreme Court] in *Porter* explicitly adopted the *Daubert* test to determine the admissibility of scientific evidence . . . [it] did not explicitly overrule Connecticut precedent regarding the evidence to which such a test should apply. Prior to *Porter*, [our Supreme Court] had recognized that the *Frye* [v. *United States*, 293 F. 1013 (D.C. Cir. 1923)] test for admissibility should not apply to all expert testimony, but only to that which involves innovative scientific techniques . . . . In *Porter* [our

Supreme Court] recognized that *Daubert*'s vagueness as to how and when to apply the factors of the test was necessary. . . . In order to maintain flexibility in applying the test, [it] did not define what constitutes scientific evidence." (Internal quotation marks omitted.) *State* v. *Furbush*, 131 Conn. App. 733, 754, 27 A.3d 497 (2011); see also *State* v. *Griffin*, 273 Conn. 266, 276, 869 A.2d 640 (2005).

In his argument at the *Porter* hearing, defense counsel stated that Allard was not offering a scientific opinion. The court disagreed and, referencing the *Porter* standard, indicated that its function was to ensure (1) that the proffered scientific evidence was predicated on reliable scientific methods and procedures and (2) that the evidence was relevant to the facts of the case. It then summarized Allard's opinions regarding the physiological effects of the chemical cocktail[11] and the blackouts that may occur during a traumatic event.[12] Applying the *Porter* standard to these facts, the court determined that the proffered testimony of Allard was inadmissible.[13]

On appeal, the defendant argues that the court should not have conducted a *Porter* analysis on Allard's opinions. Specifically, he contends that Allard's "testimony . . . was based on his education, experience and observations made in the field of use of force situations [and he did not] seek to diagnose the defendant, nor did [Allard's opinions] rely on the results of any scientific tool or protocol." Simply stated, the defendant contends that Allard's proffered opinions regarding the physiological effects of the chemical cocktail and the possibility of a blackout following his encounter with the victim did not constitute scientific evidence. See, e.g., *State* v. *Vumback*, 68 Conn. App. 313, 329, 791 A.2d 569 (2002), aff'd, 263 Conn. 215, 819 A.2d 250 (2003). In support, he relies on *State* v. *Reid*, 254 Conn. 540, 757 A.2d 482 (2000), *State* v. *Borrelli*, 227 Conn. 153, 629 A.2d 1105 (1993), and *State* v. *Hasan*, 205 Conn. 485, 534 A.2d 877 (1987).

In *State* v. *Griffin*, supra, 273 Conn. 266, our Supreme Court recited the analytic framework for determining whether a *Porter* analysis is necessary and summarized its decision in *Reid* and *Hasan*. "[O]ur initial inquiry is whether the [evidence] at issue . . . is the type of evidence contemplated by *Porter*. . . . *State* v. *Reid*, supra, 254 Conn. 549, and *State* v. *Hasan*, supra, 205 Conn. 490, are useful starting points in our analysis. In *Reid*, we concluded that microscopic hair analysis is not the type of evidence that is subject to a threshold determination of reliability under *Porter*. . . . We explained that, [a]lthough [the expert witness'] training [was] based in science, he testified about a subject that simply required the jurors to use their own powers of observation and comparison. . . . The challenged evidence in *Reid* included an enlarged photograph displaying a microscopic image of the defendant's hair

strand, side-by-side with a hair strand recovered from the victim's clothing, and expert testimony explaining the similarities and particular features of the hair strands. . . . Because [t]he jurors were free to make their own determinations as to the weight they would accord the expert's testimony in the light of the photograph and their own powers of observation and comparison . . . we concluded that the admissibility of the challenged evidence was not contingent upon satisfying the *Porter* test. . . .

"Similarly, in *State* v. *Hasan,* supra, 205 Conn. 490, [w]e concluded that [a] podiatrist's testimony [concerning the probability that a pair of sneakers would fit the defendant's feet] was not scientific evidence subject to the *Frye* test because the podiatrist merely compared the footwear to the defendant's feet. . . . Accordingly, [we determined that] the jury [was] in a position to weigh the probative value of the testimony without abandoning common sense and sacrificing independent judgment to the expert's assertions based on his special skill or knowledge. . . . [T]he podiatrist's testimony concerned a method, the understanding of which [was] accessible to the jury . . . and the value of the expertise lay in its assistance to the jury in viewing and evaluating the evidence. . . . As we recently noted, *Hasan* and *Reid* stand for the proposition that evidence, even evidence with its roots in scientific principles, which is within the comprehension of the average juror and *which allows the jury to make its own conclusions based on its independent powers of observation and physical comparison, and without heavy reliance upon the testimony of an expert witness, need not be considered scientific in nature for the purposes of evidentiary admissibility.*" (Citations omitted; emphasis added; footnote omitted; internal quotation marks omitted.) *State* v. *Griffin,* supra, 276–78.

In the present case, Allard's two proffered opinions regarding the physiological effects of the chemical cocktail and that a person in a stressful situation may blackout are inapposite to the facts of *Reid* and *Hasan,* where the jurors were asked to use their independent powers of observation and physical comparison. Here, the fact finder would need to rely on the testimony of Allard with respect to the physiological effects of the chemical cocktail and a possible blackout. Further, the fact finder would not be in a position to reach a conclusion with respect to these topics based on its independent powers of observation and physical comparison. Thus, we conclude that the defendant's reliance on *Reid* and *Hasan* is misplaced.

Additionally, we are not persuaded by the defendant's argument based on *State* v. *Borrelli,* supra, 227 Conn. 153. In that case, the defendant argued, inter alia, that expert testimony regarding battered woman's syndrome[14] did not meet the test of admissibility of scien-

tific evidence as stated in the then controlling case of *Frye* v. *United States*, supra, 293 F. 1013. *State* v. *Borrelli*, supra, 162–63. In rejecting that argument, our Supreme Court relied on the principle that the *Frye* test did not apply to all types of expert testimony, even if scientific concepts are involved. Id., 163.

The expert witness in *Frye* testified about his observations, based on his educational background and experience, regarding a large group of battered women. Id., 165. "He did not offer any opinion as to whether [the victim] was a battered woman or whether she exhibited the typical behavioral characteristics of a battered woman. [The expert] did not apply any scientific instrument or test to specific evidence in the case, nor did he use battered woman's syndrome as a diagnostic tool. Finally, he did not apply any scientific test to a hypothetical question posed by the state." Id., 164–65. Instead, his testimony was focused on characteristics commonly found in relationships that involve domestic violence and the behaviors exhibited by an individual experiencing battered women's syndrome, which include remaining in a relationship with the abuser, delaying or failing to report the abuse, minimizing or denying the harm suffered and reporting the dangerous situation to the police or a health care provider and then recanting it at a later date. Id., 168–69.

The present case is distinguishable from *Borrelli*. The expert in *Borrelli* testified about the typical behaviors of victims of domestic abuse who experienced battered women's syndrome. See also *State* v. *Vumback*, supra, 68 Conn. App. 330–32 (expert testimony regarding behaviors of children subjected to sexual abuse may act under certain circumstances not scientific evidence subject to *Porter*). Here, Allard testified about the chemistry regarding the secretion of adrenaline and noradrenaline by the adrenal gland and the resulting physiological effects of this chemical cocktail. Relying on a scientific study, he identified some of these effects as "the numbing of the—of the brain, the auditory exclusion, the visual narrowing, the fine motor skills that are lost as a consequence of blood going from the brain." Allard also relied on a psychological study to support his opinion that the chemical cocktail distorted perception and long-term memory. During cross-examination, Allard specifically acknowledged that all of the physiological reactions he had mentioned were based on the chemistry of the body. He also explained that a blackout that may occur during a traumatic encounter constituted a physiological reaction to peak stress. Allard based this opinion on his research, including experimental and psychological studies.

In contrast to the testimony in *Borrelli* regarding the possible behaviors of victims of domestic violence who suffered from battered women's syndrome, Allard testified about the specific chemical and physiological

effects of adrenaline and noradreline on the body when an individual experiences a stressful event. Allard also discussed the potential physiological reaction of a blackout as result of a traumatic or stressful situation. His testimony was premised on scientific studies. This specific scientific testimony, distinguishable from the testimony regarding possible behaviors in *Borrelli*, needed to be evaluated pursuant to the threshold admissibility standard set forth in *Porter*. See, e.g., *State* v. *West*, 274 Conn. 605, 630, 877 A.2d 787, cert. denied, 546 U.S. 1049, 126 S. Ct. 775, 163 L. Ed. 2d 601 (2005). Simply stated, we are not persuaded that these two proffered opinions fit within the holding of *Borrelli*. Accordingly, we conclude that the court did not abuse its discretion in subjecting these two proffered opinions to a *Porter* analysis.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] General Statutes § 54-82 provides in relevant part: "(a) In any criminal case, prosecution or proceeding, the accused may, if the accused so elects when called upon to plead, be tried by the court instead of by the jury; and, in such case, the court shall have jurisdiction to hear and try such case and render judgment and sentence thereon.

"(b) If the accused is charged with a crime punishable by death, life imprisonment without the possibility of release or life imprisonment and elects to be tried by the court, the court shall be composed of three judges to be designated by the Chief Court Administrator, or the Chief Court Administrator's designee, who shall name one such judge to preside over the trial. Such judges, or a majority of them, shall have power to decide all questions of law and fact arising upon the trial and render judgment accordingly. . . ."

[2] Our review of a claim of insufficient evidence is the same whether the trier of fact is a judge, a jury, or a panel of judges. *State* v. *D'Antuono*, 186 Conn. 414, 421, 441 A.2d 846 (1982); see also *State* v. *Bennett*, 307 Conn. 758, 763, 59 A.3d 221 (2013).

[3] The panel found, and the defendant does not dispute, that the defendant used deadly physical force, as evidenced by the use of a knife with a six inch blade and the nature and number of wounds sustained by the victim. See, e.g., General Statutes § 53a-3 (5) (defining "deadly physical force" as "physical force which can be reasonably expected to cause death or serious physical injury").

[4] See, e.g., *State* v. *Riggsbee*, 112 Conn. App. 787, 795, 963 A.2d 1122 (2009) (evidence that victim suffered numerous wounds while defendant "had no marks on his person" supported finding that state had disproved self-defense beyond reasonable doubt).

[5] See, e.g., *State* v. *Delgado*, 13 Conn. App. 139, 143, 535 A.2d 371 (1987) (evidence of flight introduced into evidence to show that defendant had believed what he had done was not act of self-defense and such evidence, while not absolute proof of guilt, was sufficient to allow trier of fact to infer consciousness of guilt).

[6] The parties agreed that Judge Alander alone should determine whether to preclude Allard from testifying at trial.

[7] Specifically, Allard testified that blackouts can occur following a traumatic event and are "a physiological response to the peak stress that the individual encounters . . . ." He further indicated that this opinion was based on his research, including psychological and experimental studies, but he was unable to identify these studies specifically.

[8] In *State* v. *Griffin*, 273 Conn. 266, 280–81, 869 A.2d 640 (2005), our Supreme Court specifically stated that the same standard of determining the admissibility of scientific evidence applies to cases tried before a court as those tried before a jury.

[9] In this appeal, the defendant does not argue that the court erred in its *Porter* analysis, only that it was not subject to the *Porter* threshold test for scientific evidence.

[10] In *State* v. *Maner*, Superior Court, judicial district of Waterbury, Docket No. CR-08-0375803 (July 19, 2011), the court identified the four situations

when expert testimony of innovative scientific techniques is not subject to a *Porter* analysis. "The first occurs when established techniques [are] applied to the solution of novel problems. . . . The second situation is when the scientific principles have become so well established that an explicit *Daubert* analysis is not necessary for admission of evidence thereunder. . . . The third situation is when the evidence simply requires jurors to employ their own powers of observation and comparison. . . . The fourth situation is when the testimony in not truly scientific." (Citations omitted; internal quotation marks omitted.) Id.

[11] As we noted previously, the court stated: "I mean, that's clearly scientific. I mean that's physiological. That's medicine. I don't know how one can claim that that's not scientific. And he—he outlines a number of . . . physiological effects, visual narrowing, auditory exclusions, increased heartrate, decreased breathing, loss of fine motor skills, flash of white light. But he also indicated that it's totally based on the self-reporting of police officers. There's—there's no published studies on this. He's not published on it. He's not aware of anyone else publishing on it. There's no known error rate. The self-reporting hasn't been analyzed or scrutinized to any degree. It's just accepted as wisdom because police officers said it occurred."

[12] Specifically, the court stated: "Now he testified he knows of studies but couldn't identify any. He didn't know the methodology used. He said it wasn't based on any scientific studies, and he couldn't identify any identifiable frequency that they occur. And again, this is physiological. It's—it's medicine. . . . He also indicated that his opinions weren't generally accepted in the relevant scientific community. He didn't say they weren't. He just didn't say they were."

[13] The court noted that the defendant bore the burden of establishing the reliability of Allard's opinions. It also pointed to the fact that the defendant had failed to demonstrate that Allard's opinions were accepted in the general scientific community, that the evidence had not been subjected to testing or a peer review, that Allard did not possess an undergraduate or graduate degree relevant to the scientific opinions he sought to give and that his opinions were based on the subjective reporting of the people he trained in police procedure, rather than objectively verifiable criteria. Further, the court pointed to Allard's inability to identify specifically the scientific studies that would support his opinions.

[14] The expert witness defined the syndrome "as referring to the behavioral and psychological consequences that many victims, but by no means all victims, experience as a consequence of living in domestic violence situations." (Internal quotation marks omitted.) *State* v. *Borrelli*, supra, 227 Conn. 168.